[Cite as *State v. Hodkinson*, 2022-Ohio-3931.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. Earle E. Wise, Jr., P.J. |
| Plaintiff-Appellee | Hon. William B. Hoffman, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2022 AP 01 0001 |
| MICHAEL A. HODKINSON | |
| | |
| Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDINGS:        Appeal from the Tuscarawas County
Court of Common Pleas, Case No. 2021
CR 07 0207

JUDGMENT:        Affirmed

DATE OF JUDGMENT ENTRY:        November 2, 2022

APPEARANCES:

For Plaintiff-Appellee                                  For Defendant-Appellant

RYAN STYER                                            J. REID YODER
Prosecuting Attorney                                  BENJAMIN R. SORBER
Tuscarawas County, Ohio                              DiCaudo, Pitchford & Yoder, LLC
                                                     209 South Main Street – Third Floor
KRISTINE W. BEARD                                     Akron, Ohio 44308
Assistant Prosecuting Attorney
125 E. High Avenue
New Philadelphia, Ohio 44663

*Hoffman, J.*

{¶1}   Defendant-appellant Michael A. Hodkinson appeals his convictions and sentence entered by the Tuscarawas County Court of Common Pleas on eight counts of rape and eight counts of gross sexual imposition, following a jury trial.  Plaintiff-appellee is the state of Ohio.

## STATEMENT OF THE CASE AND FACTS

{¶2}   On July 2, 2021, the Tuscarawas County Grand Jury indicted Appellant on seven counts of rape, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree; one count of rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree; seven counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4), felonies of the third degree; one count of gross sexual imposition, in violation of R.C. 2907.05(A)(1), a felony of the fourth degree.  Each of the counts except for the fourth-degree felony gross sexual imposition carried a sexually violent predator specification.  The charges arose from allegations of sexual abuse committed by Appellant against his live-in girlfriend's daughter ("the Victim") when she was between the ages of 6 and 13 years old.

{¶3}   Appellant appeared before the trial court for arraignment on July 22, 2021, and entered a plea of not guilty to the Indictment.  Appellant was released on bond with GPS monitoring.  The trial court scheduled the matter for jury trial on November 30, 2021.

{¶4}   The following evidence was adduced at trial.

{¶5}   Detective Jeff Moore of the Tuscarawas County Sheriff's Office testified he observed the forensic interview of the Victim, which was conducted at a child advocacy center on June 4, 2021. Based upon information the Victim relayed during her interview, Detective Moore proceeded to the Hampton Inn in New Philadelphia, Ohio.  Hotel records confirmed Appellant had rented a room, which was registered to his address, on August

21, at 4:28 p.m.  In order to rent the room, Appellant was required to provide a photo ID and a credit card.  During the forensic interview, the Victim disclosed Appellant had driven her to the hotel in a silver convertible.  Detective Moore was able to verify Appellant owned a silver Pontiac convertible.

{¶6}    On June 30, 2021, Detective Moore conducted an interview of Appellant at the Tuscarawas County Sheriff's Office.  A video recording of the interview was played for the jury.  Based upon Detective Moore's investigation, Appellant was placed under arrest.

{¶7}    Detective Moore monitored Appellant's phone calls while he was being held in jail.  The jailhouse calls were video recorded.  During a phone call with his daughter, Ashley Hodkinson, on July 8, 2021, Appellant placed a note in front of the video camera. The note read: "Tell your mom it's okay.  That you know when we met at the Hampton Inn two years ago beside Arby's."  Trial Transcript at 115.  Thereafter, Appellant covered the video camera with his hand.  Detective Moore explained Appellant was trying to let Ashley know the call was being recorded and she needed to be careful about what she said.  During a second call, Appellant told Ashley he was at the Hampton Inn with her mother, his ex-wife, Denise Hodkinson, and they were engaged in a sexual relationship. Detective Moore spoke with Denise Hodkinson, who indicated she and Appellant had not been together in 21 years.

{¶8}    Skyler Smolak, a caseworker and forensic interviewer with Tuscarawas County Job and Family Services ("TCJFS"), testified he was assigned to the case in June, 2021, after TCJFS received an anonymous report of suspected abuse involving the Victim.  The intake sheet reflected the referral was made to TCJFS by an unrelated

female. After he was unable to reach Trisha Jones aka Trisha McGill, the Victim's mother, by phone, Smolak proceeded to the address on the intake sheet to initiate his investigation. Appellant answered the door and told Smolak Jones was at work at WalMart and had taken the Victim with her that day. Smolak advised Appellant TCJFS had received allegations of sexual abuse involving him and explained either he or Jones and the Victim would have to leave the residence.

{¶9} Smolak spoke with Jones a few days later, informed her of the allegations against Appellant, and scheduled a forensic interview of the Victim. Judy Couts, the Victim's grandmother, brought the Victim to the child advocacy center for the forensic interview on June 8, 2021.

{¶10} The Victim was well-dressed and her hair was groomed. She was calm and made good eye contact with Smolak. When discussing things she liked, the Victim was happy and animated. Smolak described her demeanor as "overall joy, joyous." Tr. at 138. Smolak recalled the Victim's demeanor immediately changed when she began to explain why she was there that day. The Victim started to cry, "seemed very upset, nervous to talk about what she was going to tell me." *Id.* at 139. The Victim disclosed an incident at a hotel. Following the interview, Smolak advised the grandmother the Victim should not have any contact with Appellant. Smolak referred the Victim to counseling and for a medical examination.

{¶11} On cross-examination, Smolak testified the Victim indicated the abuse started when she was six years old. The Victim was 12 or 13 years old at the time of the interview. The Victim told Smolak the last incident of abuse occurred in February, 2021. On re-direct examination, Smolak stated the Victim used age appropriate language. He

added she had knowledge of sexual experiences which was not typical for a child of her age.

{¶12} M.M., the Victim's older brother, testified Appellant gave the Victim basically "anything she wanted for the most part," including a horse. Tr., Vol. II at 160. M.M. thought it was unusual as Appellant did not give his daughter anything she wanted. M.M., who was 20 years old at the time of trial, recalled he was 15 years old when the Victim disclosed Appellant's abuse. M.M. did not report the disclosure because he did not think the Victim was serious. When M.M. learned the Victim was making disclosures to her friends, he approached her again. M.M. "didn't want to tell anybody because [he] was afraid that [he] was going to put [his] mom and [the Victim] in a bad situation," specifically, losing a place to live. *Id.* at 164.v M.M. tried to be around the house to make sure the Victim was safe.

{¶13} Sometime in late 2020, M.M. received Snapchat photos from the Victim, showing her crying. M.M. spoke with the Victim then told Jones Appellant was forcing the Victim to have sex with him. M.M. described Jones as "furious." On cross-examination, M.M. acknowledged Jones and the Victim continued to live with Appellant after the disclosure.

{¶14} Trisha Jones testified she and her children moved into Appellant's home around May, 2010. Appellant's daughter, Daphne, was also living in the home on opposite weeks through the shared parenting plan between Appellant and Brenda Hall, her mother. Initially, Jones' relationship with Appellant went well. However, Appellant and Jones' three sons were not getting along and Jones and her four children moved in with her mother. A year later, Jones and the children returned to Appellant's home. Jones

described the relationship between Appellant and the Victim as close, recalling the Victim called him "dad."

{¶15} Jones stated she had foot surgery in late July, 2020, and was on leave from work for 12 weeks. One day when she was home, Appellant took the Victim to pick up food. Jones recalled Appellant and the Victim were gone for over an hour and when they returned, the food was cold. Jones was unaware of Appellant's abuse of the Victim until M.M. told her. When Jones asked the Victim about the allegations, the Victim "just blurted out balling, which made me cry." *Id.* at 196.

{¶16} Jones indicated she stayed with Appellant because she could not afford a place of her own. Jones never confronted Appellant. In order to keep the Victim safe until she could find a different place to live, Jones would take the Victim to work with her or make alternative arrangements. Jones and the Victim left Appellant's home after she was instructed to do so by TCJFS. Jones was also instructed to arrange an interview for the Victim at the child advocacy center.

{¶17} On cross-examination, Jones stated she and her children moved out of Appellant's home three times during the course of her relationship with Appellant. She and her children moved out in 2012, but moved back in with Appellant in 2013. Jones and her children moved out again in 2016. Jones, M.M. and the Victim returned to Appellant's home in 2017. Appellant kicked M.M. out of the house in April, 2021. Jones and the Victim left for the last time following TCJFS involvement.

{¶18} Karie Milburn, an employee at the Hampton Inn in New Philadelphia, identified State's Exhibit 1 as the check-out folio from a reservation at the hotel. Milburn stated the Hampton Inn requires an individual to present an ID and a credit card in order

to rent a room.  The name on State's Exhibit 1 was that of Appellant.  The check-in date was August 21, 2020, and the departure date was August 22, 2020.

{¶19} The Victim testified Appellant and Jones started dating when she was approximately two years old.  The Victim explained her father was not involved in her life and Appellant was the only father figure she had.  She stated, "He made me feel like a daughter because at the time I didn't have a dad, so he was like a father figure, took care of me.  Bought me gifts for birthdays and Christmas. * * * He treated me how he would treat his other daughters. * * * He would take me riding on is [sic] four wheeler.  He got me animals."  *Id.* at 212.  The Victim added Appellant actually treated her better than his daughter, Daphne, who lived in the home, and if she asked for something, Appellant usually said yes.  Appellant rarely told her "No."

{¶20} The Victim recalled Appellant started abusing her when she was six or seven years old, touching her breasts and her vagina.  The Victim added, "He would touch me where I should never be touched."  *Id.* at 220. She explained, "I thought it was what fathers and daughters did."  *Id.* at 221.  She recounted Appellant removing her clothing, laying her on the bed, and touching her breasts and vagina.  Appellant would remove his pants and underwear and touch her vagina with his penis. The Victim explained Appellant would keep his penis in her vagina "[u]ntil he was ready * * * [t]o spray liquid on me."  *Id.* at 225.  The Victim described the liquid as white with a "[d]isgusting odor."  *Id.*  Appellant would sometimes place his finger in her vagina.  Appellant's abuse continued until the Victim was 13 years old.  Appellant told the Victim not to tell anyone because, according to Appellant, "they wouldn't understand."  *Id.* at 229.  The Victim felt like she could not tell anyone what Appellant was doing to her.

**{¶21}** The last incident of abuse occurred in February, 2021. The Victim attempted to get away from Appellant, but Appellant grabbed her and pushed her into the bedroom. After the incident, the Victim sent a Snapchat photo of herself crying to M.M. M.M. immediately contacted the Victim and she disclosed the abuse. M.M. told Jones.

**{¶22}** The Victim detailed an incident which occurred when her friend, N.W., was visiting. The Victim and N.W. were in the Victim's bedroom with the door closed. Appellant walked in and remarked N.W. was pretty and he wanted to touch her. N.W. refused Appellant's advances. Appellant then began to grope the Victim. When asked how she was feeling at the time, the Victim stated, "Normal at the time." *Id.* at 233. N.W. observed what happened and encouraged the Victim to tell someone. The Victim was unable to disclose Appellant's abuse to anyone because she "just didn't have a voice." *Id.* N.W. helped the Victim recognize Appellant's behavior was not normal and was not appropriate. However, the Victim asked N.W. not to tell anyone because she was scared.

**{¶23}** On re-direct examination, the Victim was asked about an incident which occurred at a hotel. The Victim recalled Appellant returned home "a little drunk." Appellant told the Victim they were going to get something to eat. Jones was recovering from surgery at the time. Appellant proceeded to a hotel, telling the Victim she could swim for a little bit. The Victim waited in the car while Appellant went into the hotel to pay for the room. The pool was closed due to the pandemic. Appellant took the Victim to the room where he proceeded to touch her breasts and vagina. The Victim noted Jones was concerned when they finally arrived home because they had been gone so long.

**{¶24}** N.W. testified she has known the Victim since the two were in elementary school. N.W. detailed an incident involving Appellant which occurred while she and the

Victim were "hanging out" in the Victim's room. She recalled Appellant entered the room and pushed the Victim onto her bed. Appellant removed the Victim's pants. N.W. observed Appellant touch the Victim's vagina. Appellant then asked N.W. if he could touch her. N.W. explained Appellant wanted to touch "[m]y private area." *Id.* at 251. Feeling scared, N.W. ran out of the room and looked for Jones. N.W. was unable to locate Jones and returned to the Victim's room. The Victim pulled her pants back on and Appellant left the room. N.W. and the Victim did not discuss the incident for the rest of the day.

**{¶25}** Two days later, N.W. approached the Victim and spoke about what occurred. N.W. asked the Victim if she could tell someone or if N.W. could tell someone. The Victim said, "No." N.W. told the Victim what Appellant did was wrong. N.W. indicated the Victim thought it was just something which normally happens. The Victim asked N.W. not to tell anyone. Sometime thereafter, N.W. and the Victim were at a sleepover with two other girls when the Victim disclosed Appellant's abuse. The Victim also told the other girls not to tell anyone. On cross-examination, N.W. noted the incident in the Victim's room occurred in February, 2019, and the Victim's disclosure at the sleepover occurred in October, 2019. N.W. explained she never told anyone because the Victim had asked her not to do so.

**{¶26}** After the state rested, Appellant made an oral Crim. R. 29 motion for acquittal, which the trial court denied. Counsel for Appellant moved the trial court to allow the introduction of Defendant's Exhibit A, the video recordings of the forensic interviews of the Victim and N.W. conducted at the child advocacy center, for impeachment purposes. Defense counsel informed the trial court he had reviewed the taped

interviewed, but had not anticipated the inconsistencies in the testimony of the Victim and N.W. Defense counsel advised the trial court he intended to call the Victim and N.W. to question them regarding the inconsistencies. Defendant's Exhibit A was played for the jury. Appellant also presented the testimony of his three daughters and ex-wife. Appellant did not testify on his own behalf.

{¶27} After hearing all the evidence and deliberating, the jury found Appellant guilty of all counts in the Indictment. The trial court conducted a sentencing hearing on December 9, 2021. The trial court sentenced Appellant to life without the possibility of parole.

{¶28} It is from these convictions and sentence Appellant appeals, raising the following assignments of error:


I. APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO ADEQUATELY PREPARE FOR TRIAL AND FAILED TO ADEQUATELY CROSS EXAMINE WITNESSES IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

II. APPELLANT'S CONVICTION FOR RAPE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.


I

{¶29} In his first assignment of error, Appellant raises an ineffective assistance of counsel claim. Appellant asserts trial counsel was ineffective for failing to impeach the

Victim through her prior inconsistent statements and for failing to object to testimony relative to Appellant not allowing the Victim to keep a dog he had given to her.

**{¶30}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). In order to prevail on a claim of ineffective assistance of counsel, an appellant must show counsel's performance fell below an objective standard of reasonable representation and, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). In other words, an appellant must show counsel's conduct so undermined the proper functioning of the adversarial process the proceedings cannot be relied upon as having produced a just result. *Id.* In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. *Bradley* at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

**{¶31}** In order to warrant a reversal, an appellant must additionally show he was prejudiced by counsel's ineffectiveness. "Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel." *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Lockhart v. Fretwell*, 506 U.S. 364, 370, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The United States Supreme Court and the Ohio Supreme Court have held a reviewing court "need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, quoting *Strickland* at 697.

**{¶32}** Assuming, arguendo, trial counsel was ineffective for failing to impeach the Victim's testimony with prior inconsistent statements and for failing to object to testimony relative to the Victim's pet dog, we find Appellant failed to establish, "but for counsel's error, the result of the proceedings would have been different." *Strickland*, supra. There is nothing in the record to remotely suggest had counsel attempted to impeach the Victim with her prior inconsistent statements the jury would have been swayed to acquit Appellant of the rape charges. Trial counsel pointed out the inconsistencies during closing arguments.

**{¶33}** We turn to Appellant's argument trial counsel was ineffective for failing to object to the testimony relative to Appellant's refusal to allow the Victim to keep the dog he had given her. "The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Fears,* 86 Ohio St.3d 329, 347, 715 N.E.2d 136 (1999), *quoting State v. Holloway,* 38 Ohio St.3d 239, 244, 527 N.E.2d 831(1988) A defendant must also show he was materially prejudiced by the failure to object. *Holloway,* supra at 244. Appellant is unable to make such a demonstration.

**{¶34}** Further, we are not persuaded the trial court would have sustained counsel's objection to the testimony. Because Appellant would not likely have prevailed on such an objection, his trial counsel was not ineffective for failing to object. A claim of ineffective assistance of counsel cannot serve as an end-around to a failure to object. See, *Strickland*, supra at 689-90.

**{¶35}** Appellant's first assignment of error is overruled.

II

**{¶36}** In his second assignment of error, Appellant argues his convictions for rape were not supported by sufficient evidence. Specifically, Appellant contends the state failed to present any evidence of penetration.

**{¶37}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶38}** Appellant was convicted of seven counts of rape, in violation of R.C. 2907.02(A)(1), and one count of rape, in violation of R.C. 2907.02(A)(2).

**{¶39}** R.C. 2907.02(A) provides, in relevant part:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

* *

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

**{¶40}** R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

**{¶41}** The Victim testified as follows:

Q. [Prosecutor] He would have you in the bed. All right. So now you're in bed with [Appellant], you've got clothes on, you don't have clothes on, right. What happens next.

A. [Victim] He would touch me.

Q. Where would he touch you?

A. Vagina, boobs.

Q. Okay. You know those grownup [sic] words now, right?

A. Yes.

Q. Okay. What would he touch you with?

A. His hands on there.

Q. And how would his hands touch you?

A. Just in a weird way.

Q. Okay. How is it weird?

A. He would like, I don't know how to put it in words.

Q. How did it feel?

A. Weird, uncomfortable.

Q. Uncomfortable. What was uncomfortable about it?

A. I just don't like being touched.

Q. But you thought that's what daddies and daughters do, right?

A. Yes.

Q. But you still didn't like it? Would [Appellant] say anything to you?

A. Sometimes.

Q. What would he say?

A. Usually he would say make love.

Q. He would tell you were going to make love?

A. Yes.

Q. What does that mean?

A. Sex.

Q. Okay. Does touching you with your, with his hands on you vagina, is that sex?

A. No, but it's still part of it.

Q. So which, is that the beginning part of it?

A. Yes.

Q. So what happens after that?

A. He would usually have his pants and underwear off.

* *

Q. And once he took off the bottom half of his clothing, then what happened?

A. Usually he would touch me with his penis.

Q. Where would he touch you with his penis?

A. In my vagina.

Q. And when that happened, how did that feel?

A. Uncomfortable.

* *

Q. So after his penis felt uncomfortable in your body, them what happened?

A. He would rub it on me sometimes.

Q. Where would he rub it on you?

A. My vagina.

* *

Q. Was there ever anything different than him putting his penis in your body?

A. Can you –

Q. Did anything else ever go into your body?

A. No, sometimes he would try to put is [sic] finger.

* *

Q. And when his penis was floppy and he was holding on it and trying to insert it, could you feel that?

A. Sometimes.

* *

Q. But those times that he held it and put it down there, it would be the, would it go into your vaginal area, into, into that part of your body?  Did you feel it between there?

A. Not all the way up, but yes.

Q. When you say not all the way up, what do you mean?

A. Like, like, it was like, I don't know how to say this, it was like past the lips.

Q. And were there times when he put it all the way up?

A. Not that I know of, no.

Q. Okay.

A. I never felt it.

Q. Okay. So just inside enough to be uncomfortable. And then he would finish outside. * * *

**{¶42}** Tr., Vol. II at 223-226, 228-229.

**{¶43}** On cross-examination, counsel for Appellant asked the Victim, "So he inserted his penis inside your vagina. Correct?" *Id.* at 244.  The Victim responded, "Yes." *Id.*

**{¶44}** We find the Victim's testimony, as set forth, supra, was sufficient to prove penetration of the vagina for purposes of satisfying the element of sexual conduct as defined in R.C. 2907.01(A), and to support Appellant's rape convictions.

**{¶45}** Appellant's second assignment of error is overruled.

**{¶46}** The judgment of the Tuscarawas County Court of Common Pleas is affirmed.


By: Hoffman, J.

Wise, Earle, P.J.  and

Baldwin, J. concur